# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 4, 2014 Session

## MATRIN BECTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P27092     Glenn Ivy Wright, Judge**

_____

**No. W2014-00177-CCA-R3-PC  - Filed April 28, 2015**

_____

Following a jury trial, Petitioner, Matrin Becton, was convicted of first degree premeditated murder and sentenced to life imprisonment without possibility of parole.  He was also convicted in the same trial for especially aggravated robbery and two counts of especially aggravated kidnapping.  The trial court sentenced Petitioner to serve twenty-five years' incarceration for each conviction of especially aggravated kidnapping and especially aggravated robbery and ordered consecutive sentencing which resulted in an effective sentence of life imprisonment without possibility of parole plus seventy-five years'. Petitioner's convictions were affirmed on appeal. *State v. Matrin Becton and Antonio Sykes*, No. W1999-00581-CCA-R3-CD, 2002 WL 1349530 (Tenn. Crim. App. June 19, 2001). Petitioner filed a timely petition for post-conviction relief, which was amended and supplemented.  After several years of delays, an evidentiary hearing was finally held in 2013. The post-conviction trial court denied relief and Petitioner has timely appealed that ruling. Following a thorough review we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Marty B. McAfee, Memphis, Tennessee, for the appellant, Matrin Becton.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Steve Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Facts Developed at Jury Trial*

Pertinent facts which led to Petitioner's convictions are quoted herein from this court's opinion in Petitioner's direct appeal.

On August 29, 1997, Veronica Johnson was celebrating her birthday at the L & B Lounge in Memphis. Ms. Johnson testified that nine or ten members of the "Gangster Disciples" forced Devin Haywood, a mentally challenged man, to his knees at gunpoint and began to beat him. Marshall Shipp, the victim in this case, pushed the gang members away from Mr. Haywood and told them to leave him alone. The gang members and the victim, who was also a member of the Gangster Disciples, began to argue. Ms. Johnson testified that the victim was told that he was "no longer a Gangster Disciple" and that he had "signed his death certificate."

Cheryl Patrick, the victim's girlfriend, testified that on September 15, 1997, the victim came to her house and together they went to a Laundromat on Third Street and then to the L & B Lounge. At the L & B Lounge the victim and Ms. Patrick were confronted by 13 to 20 men. The men told the victim that they needed to talk with him in private and that he should come with them. The victim offered to follow the men in his car, but they insisted that one of their own ride in the victim's car with him and Ms. Patrick. Ms. Patrick testified that one of the men who confronted the victim was [Petitioner]. Ms. Patrick further stated that [Petitioner] was armed with a black, semi-automatic pistol. The victim, Ms. Patrick, and one of the gang members got into the victim's car. The victim then took Ms. Patrick home and followed [Petitioner] and the rest of the men.

Ricky Aldridge, the victim's cousin and also a Gangster Disciple, testified that members of the gang were required to follow certain rules or be punished. Some of the punishments included 3 minute beatings, 6 minute beatings, and death. Ricky Aldridge stated that the victim, while a member of the gang, did not participate in gang activities. Ricky Aldridge further stated that on September 15 several members of the Gangster Disciples inquired as to the whereabouts of the victim. He testified that the gang members were considering putting both he and the victim on "violation" for a previous incident. Eventually, several gang members approached Ricky Aldridge and his brother Timothy Aldridge. The gang

members took them to the apartment of a man called "Tombstone," the "governor" of a Memphis sect of the Gangster Disciples. Ricky Aldridge testified that he went with the gang members because he feared for the safety of his family if he refused. The victim was in the apartment when Ricky Aldridge arrived, along with some twenty members of the Gangster Disciples, several of whom were armed with automatic weapons.

The gang members discussed the punishments to be given to the victim and Ricky Aldridge. Tombstone told [Petitioner] to decide on and inflict a punishment. [Petitioner] then ordered all of the gang members, the victim, and Ricky Aldridge into three waiting vehicles. The vehicles drove through several neighborhoods, eventually stopping at a gas station where Ricky Aldridge was approached by Defendant Sykes and told to empty his pockets. Ricky Aldridge gave Defendant Sykes approximately twenty dollars and noticed that Defendant Sykes was wearing a gold herring-bone necklace and coin ring that the victim had previously been wearing. The vehicles were then driven to DeSoto Park where the victim and Ricky Aldridge were grabbed by the back of the pants and forced to walk up a steep hill.

Once on top of the hill, the gang members, including [Petitioner and Defendant Sykes], encircled the victim and began to beat him with their fists. The gang members beat the victim for fifteen minutes. Eventually, the gang members began using a baseball bat and a tire iron to beat the victim. Specifically, Ricky Aldridge testified that Defendant Sykes beat the victim with a baseball bat until [Petitioner] took the bat from him, told him he was not using it properly, and then [Petitioner] began to beat the victim around the head with the bat. The victim was rendered unconscious early in the assault and lay motionless as the gang members continued to beat him. When the gang members finished with the victim, they turned to Ricky Aldridge and beat him with their fists for approximately six minutes. After beating Ricky Aldridge, Defendant Sykes once again turned his attention to the victim, stripping the victim of his pants and underwear. Ricky Aldridge then noticed that Defendant Sykes had a gun. Shortly thereafter, as Ricky Aldridge was being helped back down the hill, he heard a gunshot on the hill from the direction where the victim lay. Immediately after the gunshot, [Petitioner and Defendant Sykes] came from the direction of the gunshot and began walking down the hill. Ricky Aldridge testified that [Petitioner and Defendant Sykes] were the only people in the area from which the gunshot came, and Defendant Sykes had a gun in his hand moments after

the shot was fired. Ricky Aldridge and the gang members then left the scene.

Ricky Aldridge returned later with Patrick Owen to find the victim severely injured, but still alive. They placed the victim in the backseat of Patrick Owen's girlfriend's car. Patrick Owen's girlfriend, Sharon Grafton, then called police and medical personnel. Ms. Grafton testified that the victim had been beaten severely and was bleeding profusely. She also testified that the victim was naked from the waist down. Ms. Grafton also testified that the victim had previously told her that he wanted to disassociate himself from the gang.

Timothy Aldridge, the brother of Ricky Aldridge, cousin of the victim, and also a Gangster Disciple, testified that he accompanied Ricky Aldridge to the gang meeting at the home of "Tombstone." Timothy Aldridge testified that [Petitioner and Defendant Sykes] were present at the meeting, and Defendant Sykes was armed with a .45 caliber pistol. Timothy Aldridge further testified that at the conclusion of the meeting [Petitioner] announced that he would handle the punishments of the victim and Ricky Aldridge. Timothy Aldridge stated that he rode to DeSoto park in the same car as the victim and was present when Defendant Sykes ordered the victim to take off his jewelry. Timothy Aldridge then saw Defendant Sykes put on the jewelry. Timothy Aldridge continued to testify about the severe beating incurred by the victim, and he admitted that, because of his fear of the other gang members, he feigned participation in the attack by "pretending" to hit the victim. Timothy Aldridge was helping his brother back to the vehicles when he heard a gunshot from the location of the victim. Timothy Aldridge further stated that [Petitioner and Defendant Sykes] were the only people in the area from which the gunshot came.

Officer William Poteet of the Memphis Police Department responded to a dispatch call at approximately 1:30 a.m. on September 15, 1997, and found the victim in the back seat of a car, covered in blood and naked from the waist down. The officer stated that the victim's injuries were so severe he thought the victim had been shot in the head. Dr. Thomas Deering, assistant medical examiner, testified that the victim suffered blunt trauma to the head, multiple skin lacerations, multiple puncture wounds, and a gunshot wound to the left buttock. Dr. Deering further stated that the blows to the victim's head caused his skull to fracture and pieces of bone to enter the victim's brain. The doctor testified that the victim died as a

result of the head trauma complicated by the bleeding caused by the gunshot wound. Jacqueline Yancey, a former girlfriend of Defendant Sykes, and Arthur Jones, Ms. Yancey's cousin, both testified that approximately a week after the victim's death they saw Defendant Sykes wearing the victim's gold necklace and ring.

Robert Walker, the "head of security" for the Memphis Gangster Disciples, also testified that he was present when "Tombstone" complained to the head of the Memphis gang that the victim had become "rebellious" and should be punished. Mr. Walker testified that "Tombstone" was told to "take care" of the victim. Mr. Walker also outlined the organizational structure and forms of punishment used by the gang. Specifically, Mr. Walker stated that one way gang members would symbolize their displeasure with another gang member while carrying out a death punishment would be to strip the person of his clothes and shoot him in the buttocks. Furthermore, Walker testified that [Petitioner] informed Walker that he shot the victim.

*Matrin Becton and Antonio Sykes*, 2002 WL 1349530 at *1-*3.

**Petitioner's Issues on Appeal**

On appeal Petitioner has asserted three general grounds in support of post-conviction relief. These are: (1) *Brady* violations by the State, *see Brady v. Maryland*, 373 U.S. 83 (1963); (2) prosecutorial misconduct; and (3) ineffective assistance of counsel at both the trial level and on direct appeal. Petitioner was represented at both the trial level and on direct appeal by the same attorney. Specific relevant allegations by Petitioner as to each general ground for relief are specified as follows.

*(I) Brady Violations*

Petitioner argues that the following exculpatory evidence was withheld by the State in violation of *Brady*:

(1)     A written statement of prosecution witness Robert Walker in which Walker implicated himself in the murder of a man named Kelbert Hailey;

(2)      A written statement of a person named Albert Cleveland Wilson which implicated the same Robert Walker in the murder of a man named Billy Ray Brown;

(3)      The transcript of testimony by the same Robert Walker in federal grand jury proceedings, in which Walker implicated himself in the murders of Marshall Shipp (whose murder Petitioner's murder conviction involves) and Kelbert Hailey;

(4)      Agreement between the State and the same Robert Walker for favorable treatment in dispositions of criminal acts by Walker in exchange for Walker's testimony against Petitioner.

*(II) Prosecutorial Misconduct*

Petitioner did not plead in any of the applicable petitions/supplements for post-conviction relief, or argue to the post-conviction court, the legal theory that he was entitled to post-conviction relief because of prosecutorial misconduct. On appeal, this theory for relief is asserted by arguing that the State committed unconstitutional prosecutorial misconduct by "failing to disclose agreements between witnesses and the State, failing to disclose the substance of Robert Walker's testimony, and failing to disclose *Brady* material." Petitioner included in his argument on this issue that "[i]t is of note that the Shelby County District Attorney's Office has a history of being reprimanded for similar violations." Pursuant to a directive from this court during oral argument, Petitioner submitted a list of court decisions which he asserts support this allegation.

*(III) Ineffective Assistance of Counsel*

Petitioner argues on appeal that he is entitled to post-conviction relief because trial counsel (who also represented Petitioner in his direct appeal) rendered ineffective assistance of counsel in the following ways:

(1)      Failed to raise on appeal the issue of *Brady* violations by the State;

(2)      Failed to "seek out" the testimony of Robert Walker;

(3)      Failed to object to trial court errors:

        (i)      the trial court failed to instruct the jury on the lesser-included offenses of facilitation of the charged offenses;

(ii)    the trial court failed to instruct the jury on the "natural and probable consequences rules";

(iii)    the trial court failed to instruct the jury on the defense of duress;

(iv)    the trial court failed to instruct the jury "as to the burden of proof during the guilt phase jury charge";

(4)    Failure to move for mistrial based on "trial by ambush".

### *Summary of Testimony at Post-Conviction Hearing*

Petitioner did not testify at the post-conviction hearing. Petitioner presented the testimony of one of the assistant district attorneys ("the prosecutor") who represented the State in Petitioner's trial, and he also presented the testimony of his trial counsel. The State called as its only witness attorney Louis Chiozza, III, who represented Robert Walker during all relevant times concerning Petitioner's case in criminal court. We will summarize the proof presented at the post-conviction hearing in light of the specific issues raised in this appeal.

Trial counsel testified that at the time of the post-conviction hearing his law practice was mostly criminal defense work and had been so for about twenty years. He had represented over one hundred persons in murder cases. Upon Petitioner's motion and without objection by the State, trial counsel was declared by the post-conviction court as an expert witness in the field of criminal defense work.

Trial counsel recalled that the amount of discovery he received from the State was "scant," in fact "[i]t was one of the smaller sets of discovery I've received in a murder case." Trial counsel utilized the help of an investigator to prepare for trial. Due to the fact that Petitioner had provided a statement to police wherein Petitioner acknowledged he was near the scene of the offenses (even though he denied participation in the crimes), trial counsel's strategy was to prepare for cross-examinations. He was not planning to present much, if any, proof by way of a case-in-chief. Trial counsel did not recall ever receiving *Brady* exculpatory or impeachment information from the State prior to trial. Trial counsel had filed motions pre-trial for *Brady* material and for witness impeachment information. The State filed a response to the latter motion in which it specifically agreed to advise defense counsel promptly of any consideration or promises of consideration given to government witnesses.

Trial counsel identified a ruling by the trial court at a pre-trial hearing on July 13, 1998. The State was ordered to disclose to defense counsel both its formal and "informal" agreements with co-defendants and other witnesses. Specifically, the trial court ordered,

> THE COURT: Well, I'll rule in this manner. If the State plans to call any co-defendants to testify in their case in chief, I'll require them to let defense counsel know exactly what the circumstances are surrounding that testimony. If it's a specifically negotiated deal in exchange for a lesser sentence, or even if it's simply a statement that you're welcome to testify and if you do, then we'll consider your case afterwards and no promises are being made, which is generally the case.

There were originally at least fifteen persons charged with the murder of the victim. After the trial court made the above ruling, counsel for one of Petitioner's co-defendants sought clarification from the trial court as to whether the ruling applied to all State's witnesses who had been offered consideration and not just those who had been charged as co-defendants. The trial court agreed that the disclosure ruling applied to *all* witnesses called by the State. The first trial date for Petitioner's case was in November 1998. Trial counsel did not know that Robert Walker ("Walker") was a witness until just before the scheduled trial because his name had not been included on the witness list provided by the State. The trial was ultimately continued until February 1999. When asked at the post-conviction hearing if he had received any disclosure from the State regarding any potential agreement with Walker between November 1998 and February 1999, trial counsel testified,

> I cannot remember. And I apologize; I just can't remember if it was disclosed to me that there'd be some consideration for him after testimony, but I can't – Robert Walker was a very – I don't know what the word I'm searching for is, but I could find very little about Robert Walker.

Prior to November 1998, trial counsel could not find any references to Walker in any of the documents provided in discovery. Walker was not charged as a defendant in any offense(s) related to the victim's death. After learning that Walker was a witness in Petitioner's case, trial counsel discovered that Walker was being represented by Mr. Chiozza on unrelated charges. Trial counsel sought Mr. Chiozza's permission to interview Walker pre-trial, and that request was denied. Trial counsel testified that he could have used in his defense of Petitioner all information about any considerations provided to Walker from the State for Walker's testimony. Trial counsel recalled that he did bring up during Walker's trial testimony that Walker had not been charged with any crimes involving the victim's

death. Trial counsel's understanding at the time of Petitioner's trial was that Walker was "the second person" who answered to an individual in the gang who "was in charge of everything."

Trial counsel knew by the time of Petitioner's trial that Walker had two pending aggravated robbery charges. Trial counsel was not told about any uncharged criminal acts of Walker. Trial counsel testified that Walker's direct testimony ended on a Friday, and he had the weekend to review materials provided to him at trial for preparation of his cross-examination of Walker. After Walker's direct testimony, the State gave trial counsel a transcript of Walker's testimony to a federal grand jury. It had multiple black line redactions. Trial counsel moved the trial court to order the State to provide a totally unredacted transcript, but the trial court ruled that trial counsel could only have such parts of Walker's grand jury testimony that related to the case for which Petitioner was being tried.

Trial counsel identified previously marked post-conviction hearing exhibit number 5, the transcript of Walker's federal grand jury testimony. The exhibit copy of the transcript had no redactions. As stated above, trial counsel was not provided with a copy of Walker's federal grand jury testimony, with redactions, until after Walker's direct examination during Petitioner's trial.

Trial counsel also examined post-conviction hearing exhibit number 3, which was a transcript of a hearing in Petitioner's murder case on Friday, November 6, 1998, three days before the trial was originally scheduled to start. Several pre-trial matters were taken up at this particular hearing, including Petitioner's request for a continuance because Walker's name (as well as two other witness's names) as a witness had not been previously provided to Petitioner by the State. Petitioner's trial counsel accepted the State's explanation in open court that Walker's name had been inadvertently omitted from disclosures. Announcements were made in court by an attorney for a co-defendant that Walker's attorney would not permit any other attorney to talk to Walker, even in Walker's attorney's presence. Furthermore, Walker's attorney refused to disclose the substance of Walker's anticipated testimony. Therefore, as to trial counsel's request to continue the trial, the trial court found little chance of prejudice to Petitioner because of the inexcusable oversight of the State in failing to inform trial counsel earlier that Walker would be a witness. Immediately after the trial court made the observance set forth above that there was little, if any, prejudice to Petitioner, the following comments were made.

[Prosecutor]: Your Honor, one additional thing we can probably do just as, I can inform counsel of the, you know, generally the substance of his testimony as it relates to his client. But, I don't know how it affects him

|                    | strategically. I could tell him, I can do the same with Mr. [Stein]. Mr. Pitman already knows. I mean, I've told him basically what his testimony is in regards to Mr. Mickens. I could do that and then, I mean, you know, that would probably help out. |
|--------------------|---|
| [Trial Counsel]:   | That would be good, Your Honor. My guess is I'm assuming it's not going to change the facts in the case, I mean, wouldn't think. I mean, I would say that if it - - - - - |
| THE COURT:         | All right. Well, you all meet with [Prosecutor] and discuss that matter with him. |

Trial counsel testified at the post-conviction hearing that it was his understanding that the prosecutor was going to disclose the nature and substance of Walker's expected testimony, without qualification. Ultimately the trial was continued until February 1999 for an unrelated reason.

Trial counsel testified that he did not receive any such information from the prosecutor prior to Walker's testimony. Trial counsel further testified that he was surprised by Walker's trial testimony, specifically that Petitioner told Walker in jail what Petitioner had done regarding the crimes for which he was on trial. Trial counsel added that if he had possessed this particular information prior to trial, he would have added to his efforts to reach a negotiated plea agreement for Petitioner.

Trial counsel testified that in his experience he would strongly consider using "uncharged criminal conduct" to impeach the credibility of a State's witness, on the basis that the witness's credibility is tainted by an agreement for leniency in exchange for testimony. Trial counsel was able to utilize a full weekend after Walker's direct examination in order to use statements provided by the State pursuant to Tennessee Rules of Criminal Procedure 26.2 ("*Jencks*" statements) to prepare for cross-examination of Walker.

Trial counsel was asked to examine post-conviction hearing exhibit number 7, a written statement of Walker to Germantown Police Department investigators, given on November 19, 1997. Trial counsel testified "I don't believe so" when asked if he had read the statement prior to the day of his post-conviction hearing testimony. In later testimony during direct examination trial counsel stated unequivocally that he never received a copy of Walker's statement to the Germantown police investigators before or during Petitioner's trial. The statement mostly pertained to Walker's knowledge and participation in a gang

ordered murder of a member named Kelbert Vernon Hailey ("Hailey"). Other gang dealings, including the homicide of the victim in Petitioner's case, were also discussed.

Trial counsel stated that he possibly would have used the statement by Walker to the Germantown police investigators in order to show Walker was receiving an advantage of not being charged with the murder of Hailey. However, trial counsel qualified this statement. He testified that since the scenario concerning the death of Hailey was so similar to the scenario concerning the death of the victim in Petitioner's case, a strategic decision would have to be made by any counsel. Trial counsel explained:

> The only thing I can see would cause a problem - - and there's not really enough time for me to go through everything here, the case and stuff, with my thought process - - would be the fact that it's awful similar to the exact same set of facts that we had in [Petitioner's] case.

> And you sort of run a fine line with this statement as to are you - - are you bringing out information that he's getting off of a charge, or are you giving him credibility that, yeah, he's been in multiple homicides with the exact same set of facts?

Trial counsel emphasized that he had not made a tactical decision to not use Walker's statement to Germantown police detectives because, "the first time I've ever heard Kelbert Hailey's name was this morning."

Trial counsel examined the written statement given to law enforcement officers by Albert Cleveland Wilson ("Wilson") which implicated Walker in the death of Billy Ray Brown ("Brown"). This statement was ultimately admitted as an exhibit to the post-conviction hearing. Trial counsel testified that he had never seen the statement before the day that he testified at the post-conviction hearing. Trial counsel explained the relevant portion of the Wilson statement was that Walker was implicated in an additional murder for which the State did not charge Walker. Trial counsel testified that had he been provided this statement, he would have attempted to impeach Walker's credibility as to getting a "pass" on criminal conduct and possibly could have used Wilson as a witness to impeach Walker under certain circumstances.

As to Wilson's statement which was never disclosed to trial counsel, trial counsel testified that he would have had to subpoena Wilson to testify at trial in order to use his knowledge of Walker's criminal acts in order to impeach Walker and that several evidentiary rules would have to be complied with to allow Wilson's testimony to be admissible. However, trial counsel added that if he had received Wilson's statement prior to trial, he

-11-

would have had a good faith basis to ask Walker if he had avoided prosecution for the murder of Brown by agreeing to testify against Petitioner, but without Wilson present, he would be bound by Walker's answer.

Trial counsel admitted that the motion for new trial filed by him on Petitioner's case did not ask for a new trial on the basis of a *Brady* violation. However, trial counsel added that at the time he prepared the motion for new trial, he had not received copies of, or been informed of, the statements of Walker to the Germantown police investigators and of Wilson's statement.

Also at the post-conviction hearing, trial counsel read a portion of the trial transcript of Walker's cross-examination. Walker denied having any participation at all in the murder of the victim whose death resulted in Petitioner's convictions. Trial counsel testified that if he had received Wilson's and Walker's written statements to police, he could have "potentially" dealt with Walker's answers "differently."

On cross-examination, trial counsel testified that he did not know and could not remember if he asked the prosecutor between November 1998, and the trial in February 1999, for the information promised in November concerning Walker's anticipated testimony. Trial counsel admitted that he was not surprised by Walker's testimony during direct examination at trial that Walker was not given promises or consideration for his testimony but that he hoped for his testimony to be taken into consideration for him at a later date. Trial counsel added, "that's [par] for the course, at least in our county it is." Trial counsel admitted that as of the date of the post-conviction hearing, approximately fourteen and one-half years after the trial, he still did not know whether the State agreed to not prosecute Walker for any criminal charges pertaining to the murders of Hailey and Brown, even though they could have brought charges.

Trial counsel testified that he presently did not have possession of the *Jencks* material provided to him by the prosecutor at the close of Walker's direct examination at trial. He had given his entire file to Petitioner's post-conviction counsel. Trial counsel added, regarding the redacted information, he asked the court to order the State to provide non-redacted material. The trial court ordered the redactions to remain in the copy provided to trial counsel because the portions deleted by the State did not pertain to the murder of the victim in Petitioner's trial. Regarding negotiating a plea agreement for Petitioner, trial counsel admitted that the prosecutor had not agreed to negotiate any plea deal, and there was no reason for him to change his mind if trial counsel had received all of the information not given to him prior to trial. Trial counsel acknowledged that there was "a lot of testimony" at trial in addition to Walker's testimony that incriminated Petitioner. He also acknowledged

that his closing argument at trial, a transcript of which was made an exhibit, reflected his trial strategy.

No testimony at the post-conviction hearing was elicited from trial counsel concerning the following allegations of ineffective assistance of counsel: failure to request jury instructions on the lesser-included offenses of facilitation of each charged offense, failure to request jury instructions on the "natural and probable consequences rules," failure to request jury instructions of the defense of duress, failure to request the trial court to instruct the jury as to the State's burden of proof, and failure to move for a mistrial because of the State's "trial by ambush."

Testimony was elicited from trial counsel in only two of the areas of ineffective assistance of counsel alleged on appeal in the case *sub judice*. These are the allegations of trial counsel's failure to raise *Brady* issues on appeal and trial counsel's failure to "seek out" the anticipated testimony of Walker prior to trial through contact with the prosecutor pursuant to the prosecutor's representations in court in November 1998. As outlined above, the testimony of trial counsel on these two issues was minimal.

The prosecutor testified at the post-conviction hearing that he had been practicing law for twenty-seven years. He prosecuted the case against Petitioner, who was one of fifteen defendants charged in the murder of the victim. He acknowledged that he had signed a response to trial counsel's motion seeking disclosure of agreements between the State and any prosecution witness. The prosecutor agreed that the response included the following: "The State agrees to advise Defense Counsel promptly of any consideration or promises of consideration given to or made on behalf of government witnesses." After several objections from the State's post-conviction prosecutor as to leading and to relevance (which was overruled) the witness prosecutor reluctantly acknowledged, regarding his understanding of the trial court's order that even hopes of leniency "agreements" by a witness had to be disclosed prior to trial, that

> My understanding was that the Court ruled as the Court ruled, and that I had
> to follow what the Court ruled on that that's reflected on Page 38 [of the
> transcript of pre-trial hearings on July 13, 1998].

The prosecutor, after reading from a transcript of pre-trial proceedings on November 6, 1998, admitted that he had offered to inform trial counsel the substance of Walker's anticipated trial testimony. However, the prosecutor further testified that circumstances changed and he did not have to honor his stated intention because the "whole deal" was rendered moot. The prosecutor testified,

| | |
|---|---|
| [Petitioner's<br>Post-conviction<br>Attorney]: | Did your agreement to let Defense Counsel know the substance of Robert Walker's testimony still stand, or did it not? |
| [Prosecutor]: | At the time that we were trying not to continue the case in November, I told the Court what I would do and I talked with [trial counsel] at the time. And then the case got continued anyway which rendered all of that moot. We were trying not to continue the case because everybody was ready for trial. And so I was trying to do what I could do to further it along, and we - - you know, at the time - - but it wound up being continued anyway, so it rendered that whole deal mute - - excuse me - - moot. |

The prosecutor admitted in his testimony that a transcript of Walker's federal grand jury testimony was not given to Petitioner's trial counsel until it was provided as *Jencks* material at trial after Walker had testified on direct examination. The prosecutor examined the statement given by Walker to Germantown police investigators regarding the murder of Hailey. The prosecutor surmised that the statement "probably was given [to trial counsel] as *Jencks* material at some point in the trial," but the prosecutor stated he did not "have an independent memory of that."

The prosecutor reviewed the statement of Wilson which implicated Walker in the murder of Brown, but the prosecutor testified that he had no recollection of having previously seen the statement. The prosecutor acknowledged that in November 1999, which was about nine months after Petitioner's trial, Walker disposed of his two pending aggravated robbery charges by entering into a negotiated plea agreement. Pursuant to the agreement, each charge was reduced from a Class B felony to the Class D felony of facilitation of robbery, and Walker received an effective "time served" sentence of two years for the two convictions. The prosecutor added that Walker was never prosecuted for any charges, specifically conspiracy, regarding the murder of the victim in Petitioner's case. The prosecutor was not aware of any charges being placed against Walker for the murders of Hailey and Brown.

Louis Chiozza, III, testified at the post-conviction hearing that he is a general practice attorney, including criminal defense work, with seventeen years of experience. He was the attorney for Walker on two aggravated robbery charges in the late 1990's pertinent to the time period of Petitioner's charges for which he was convicted. Mr. Chiozza, III, was

-14-

not aware of any other charges pending against Walker. Mr. Chiozza, III, spoke with the prosecutor in Petitioner's case about Walker giving statements and testifying in numerous cases, including Petitioner's trial. A portion of Walker's federal grand jury testimony, set forth below, was read to Mr. Chiozza, III. He testified that the following testimony of Walker accurately set forth the "agreement" between Walker and the State:

[Prosecutor]:      And you've been in custody since November of 1997; is that right?

[Walker]:      Yes, sir.

[Prosecutor]:      And on those two charges, have - - first, have we made any promises to you about how much time you will receive on those charges in exchange for your testimony?

[Walker]:      No, sir.

[Prosecutor]:      Okay. Do we have a specific deal regarding your testimony at this point?

[Walker]:      No, sir.

[Prosecutor]:      All right. Now, even though we do not have any specific deal or have not made any promises to you, is it your - - is it your hope that your - - that your cooperation in this matter will result in some consideration to you on the handling of those charges?

[Walker]:      I would like to think so.

[Prosecutor]:      And have we discussed that?

[Walker]:      Yes.

[Prosecutor]:      Okay. We discussed that several times, but as far as making any specific promises about specific lengths of time and so on, we have not done that at this point; is that right?

[Walker]:            No, sir.

Mr. Chiozza, III, testified that he would not have permitted trial counsel or any attorney for any of Petitioner's co-defendants to interview Walker. Also, Mr. Chiozza, III, stated that he would not tell any other attorney anything about Walker's knowledge or anticipated testimony.

Mr. Chiozza, III, testified that he had not seen the statement of Wilson implicating Walker in Brown's murder until it was shown to him the day immediately prior to his post-conviction hearing testimony. He was not familiar with any of the allegations against Walker that were in the statement. He also had never seen Walker's statement to police concerning his involvement in the Hailey murder until the day before his post-conviction hearing testimony.

### Post-Conviction Court's Ruling

The post-conviction court entered an order which denied post-conviction relief. The court made the following findings of fact which are relevant to the issues raised in Petitioner's appeal:

(1) The trial court specifically ordered the State to disclose to Petitioner "*any possibility* of the State offering a 'deal' or an 'agreement' to a *witness* for his or her testimony, however informal the agreement." (emphasis added).

(2) The prosecutor disclosed information regarding Walker's "pending homicide charges" to trial counsel as *Jencks* material (after Walker's direct examination at trial) rather than pre-trial as *Brady* material. Trial counsel was "uncertain whether he received these impeachable statements implicating Walker in another homicide. The post-conviction court found that taking these facts as true, "it does not indicate that [trial counsel] did not have this information [Walker's statement to Germantown investigator's and Wilson's statement to police] prior to cross-examination of Walker."

(3) The post-conviction court accredited testimony of trial counsel that he "may or may not" have used or been able to use the information in the statements even if they had been disclosed.

-16-

(4) Walker's testimony to the federal grand jury was only *Jencks* material, and did not have to be disclosed until after Walker's direct examination at trial, which was done in this case.

(5) The post-conviction court implicitly found that Petitioner was not prejudiced by trial counsel's alleged deficient performance by failing to "seek out" pre-trial the anticipated trial testimony of Walker, because "the State was under no legal obligation to disclose this information prior to Walker's testimony."

The post-conviction court did not make any specific findings of fact on the remaining issues raised by Petitioner on appeal. However, the post-conviction court correctly found that no proof was presented by Petitioner in support of his allegations that trial counsel was ineffective for failing to object to the trial court's failure to properly charge: (a) the burden of proof; (b) facilitation as a lesser-included offense to each charge; (c) the natural and probable consequences rule; and (d) the defense of duress.

The post-conviction court made no specific findings as to whether trial counsel rendered ineffective assistance of counsel by failing to move for a mistrial based on "trial by ambush." This is understandable because no proof was presented at the hearing on this allegation. The post-conviction court also made no findings of fact regarding "prosecutorial misconduct," again understandably because this theory was not presented at the post-conviction hearing.

The post-conviction court implicitly found that *all* violations of *Brady* as have been alleged by Petitioner on appeal were not, in fact, *Brady* violations. Therefore, the post-conviction court's lack of specifically making findings of fact concerning trial counsel's failure to raise *Brady* violations as an issue in the direct appeal of the convictions, though an erroneous failure by the post-conviction court of its duties, T.C.A. § 40-30-111(b), is nevertheless harmless.

*Analysis*

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment

-17-

entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the post-conviction court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690;

*Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We will first address Petitioner's waiver on appeal of some of his issues. As noted above, Petitioner did not plead "prosecutorial misconduct" as a theory of relief, nor argue that theory at the trial court level in this post-conviction proceeding. Issues and theories raised for the first time on appeal are waived. *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Petitioner also failed to present any evidence at the post-conviction hearing concerning his assertions on appeal that trial counsel rendered ineffective assistance of counsel by failing to object to the specified errors by the trial court and by failing to move for a mistrial based upon "trial by ambush." Without some evidence presented in support of these grounds, Petitioner has again raised issues for the first time on appeal and/or clearly failed to establish his allegations of fact by clear and convincing evidence.

Revisiting the asserted ground of prosecutorial misconduct, this court recognizes that Petitioner submitted, after oral argument and at the direction of this Court, eighteen cases that support the assertion in his brief "that the Shelby County District Attorney's Office has a history of being reprimanded" for failure to disclose *Brady* material and plea agreements

between witnesses and the State. In its response to Petitioner's supplemental briefing, the State admitted that all eighteen cases addressed *Brady* claims and "a few are somewhat critical of the Shelby County District Attorney's office," but argues that in only one case was the Shelby County District Attorney's office "reprimanded" - based on a "reprimand" being defined as discipline from the Board of Professional Responsibility of the Supreme Court of Tennessee. Although we must conclude that the alleged "prosecutorial misconduct" ground in this post-conviction case's appeal has been waived, we do acknowledge Petitioner's counsel's enlightening this court on this issue.

We now address the issues properly reserved for consideration in this appeal.

(I) *Brady Violations*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Tennessee Supreme Court has held that a defendant must show four elements in order to establish a *Brady* violation by the State:

(1)     that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

(2)     that the State suppressed the information;

(3)     that the information was favorable to the accused; and

(4)     that the information was material.

*Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001).

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and *evidence that could be used to impeach the State's witnesses*." *Id*. at 55-56. (emphasis added). "Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id*. at 58 (quoting *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995). In determining whether a defendant had adequately proven the materiality of favorable evidence suppressed by the State, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole

case in such a different light as to undermine the confidence of the verdict.'" *Johnson*, 38 S.W.3d at 58 (quoting *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998).

There was no dispute in the testimony that Wilson's statement to police (in which Wilson implicated Walker in the murder of Brown in an unrelated case) was never provided to trial counsel. There is no dispute that Walker's federal grand jury testimony, though it contained some redactions, was provided to trial counsel during the trial as *Jenck's* material after Walker's direct examination. Petitioner failed to produce a copy of Walker's federal grand jury testimony with the redactions, so both the post-conviction trial court and this court are unable to determine what portions of the transcript were entirely withheld from Petitioner both pre-trial and through the conclusion of the trial.

The testimony as to whether Walker's statement about his involvement in the murder of Hailey, which Walker gave to Germantown investigators, is not clear on whether the State ultimately gave a copy of this statement as *Jencks* material at the close of Walker's direct examination. However, the post-conviction court made a credibility determination that Petitioner *failed to* show that trial counsel "did not have this information prior to cross-examination of Walker." Our review of the testimony regarding disclosure of Walker's statement to Germantown investigators, without redactions, discloses that the preponderance of evidence weighs in favor of the conclusion that this statement by Walker *without* any redactions, was not disclosed to trial counsel either pre-trial or as *Jencks* material. The post-conviction court's specific factual findings on this issue are as follows:

> [The prosecutor] testified that he disclosed information regarding Walker's pending homicide charge as *Jencks* material rather than *Brady* material, and [trial counsel] is uncertain whether he received impeachable statements implicating Walker in another homicide. PC Tr. Vol. I, 76-78; PC Tr. Vol. II, 95. Taking these statements as true, it does not indicate that [trial counsel] did not have this information prior to cross-examination of Walker.

Our review of the testimony cited by the post-conviction court shows that the prosecutor testified, regarding Walker's statement implicating himself in the murder of Hailey, that the statement "*probably* was given as *Jencks* material at some point in the trial, I think." (emphasis added). The prosecutor further testified that,

> Well, I believe this was turned over as *Jencks* material during the trial, but I would have to - - I mean, I would need to see the record, and you know, and whatever the discovery packet, you know, materials that [trial counsel] received. I mean, I don't have an independent recollection of that, but I think, in looking at these transcripts, though, that I think, you know, this

would - - appears to be a statement that was turned over during *Jencks*, but
I don't have an independent memory of that.

Regarding trial counsel's testimony concerning disclosure (or non-disclosure) to him of Walker's statement to Germantown investigators, trial counsel did initially answer "I don't believe so" when asked by Petitioner's counsel whether he had read the statement prior to the day he testified at the post-conviction hearing. However, later in his testimony, trial counsel explicitly stated that the first time he had ever heard of Hailey (the named murder victim in the Walker statement) was the morning of his post-conviction testimony. In other portions of his testimony, on both direct examination and cross-examination, trial counsel explicitly stated that he did not receive from the State any statement or portion of a statement by Walker wherein Walker implicated himself in the homicide of Hailey. Our review of the trial transcript of *Jencks* material discussions reveals that in addition to the redacted federal grand jury testimony of Walker, a redacted written statement by Walker also was provided to the trial counsel as *Jencks* material, but this redacted statement by Walker is not clearly identified. Based upon all of this, we conclude that Walker's statement, with all portions relating to Walker's involvement in the homicide of Hailey redacted, was provided as *Jencks* material. However, the redacted statement, like the redacted transcript of Walker's federal grand jury testimony, is not in the record. Trial counsel testified at the post-conviction hearing that the *Jencks* material provided to him at trial was included in his case file handed over to Petitioner's post-conviction counsel prior to the post-conviction hearing.

As to Petitioner's assertion that Wilson's statement to Memphis police implicating Walker in the death of Brown was subject to disclosure under *Brady*, we conclude that Petitioner has failed to prove that Wilson's statement is "material" as that term is defined under *Brady*. Wilson was not called to testify at the post-conviction hearing to testify regarding the subject statement. In this record on appeal, all that Petitioner has shown is that a third person (Wilson) gave a statement to police that Walker (a witness for the State in Petitioner's trial) was a participant in a homicide of a man named Brown. *If* trial counsel had been in possession of Wilson's statement during trial, without Wilson being personally available, all he could have done was ask Walker if he was facing charges for the homicide of Brown, or if he had committed Brown's homicide, and trial counsel could not have impeached Walker's testimony with the statement of Wilson. *State v. Marlow*, 665 S.W.2d 410 (Tenn. Crim. App. 1983); Tenn. R. Evid. 608. Also, Walker did not testify at the post-conviction hearing in order to show what his answers would have been at trial *if* trial counsel had possessed Wilson's statement. We are obligated to conclude that Wilson's statement *could not* "reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." *Irick*, 973 S.W.2d at 657.

Similarly, without copies of the redacted federal grand jury testimony and the redacted statement of Walker, we cannot be sure what was never disclosed to Petitioner before the end of the trial. We can speculate, but that is not sufficient to come to the conclusion that evidence withheld from Petitioner (and evidence was definitely withheld - *anything* redacted was withheld) was either favorable or material under *Brady*. Petitioner is not entitled to relief on this issue.

*(II) Ineffective Assistance of Counsel*

(A) failure to raise *Brady* issues on appeal

Even though the State may be correct in its argument that Petitioner waived all *Brady* claims in his post-conviction proceedings by not raising it in his direct appeal, we have addressed this issue because: (1) it was addressed by the post-conviction court, and (2) a conclusion, after appellate review, that *Brady* violations were not established by Petitioner, leads to the conclusion that Petitioner's claim that trial counsel rendered ineffective assistance by failing to raise the *Brady* issues on appeal is without merit. Counsel does not render deficient performance by not raising a meritless issue on appeal. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995); *Porterfield v. State*, 897 S.W.22d 672, 678 (Tenn. 1995); *State v. Matson*, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986).

(B) failure to "seek out" the testimony of Walker prior to trial

There is no question that the prosecutor told the trial court in open court that the substance of Walker's expected trial testimony would be provided to trial counsel prior to Walker's testimony. However, the prosecutor never did what he said he would do. The prosecutor did testify at the post-conviction hearing that he made this promise on a Friday afternoon in order to keep the trial, scheduled to begin the following Monday, from being continued at Petitioner's request because Walker's name as a witness had not been previously disclosed to trial counsel. The trial was ultimately continued the following week for different reasons.

Trial counsel testified that he made efforts to interview Walker and talk to Walker's attorney in order to discover Walker's anticipated testimony prior to the trial. Walker's attorney refused to disclose Walker's expected testimony and he also refused to allow trial counsel to interview Walker. The prosecutor testified at the post-conviction hearing that after the trial was continued for approximately three months, he felt he was no longer bound by his offer to give trial counsel a summary of Walker's anticipated trial testimony.

Petitioner failed to put forth evidence or cite to any law that would have required the trial court to force the prosecutor to "keep his word" and give trial counsel Walker's testimony prior to Walker's direct examination. The prosecutor's ultimate decision to not provide to trial counsel what he had promised in open court to provide, while perhaps a breach of decorum by an attorney, was a matter not within the purview of the rules of procedure governing the practice of criminal law in Tennessee. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Having concluded that some of Petitioner's issues on appeal are waived, and that Petitioner is not entitled to relief in his remaining issues, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE